Filed 10/31/23  L.J. v. R. J. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| L.J.,<br><br>    Respondent,<br><br>      v.<br><br>R.J.,<br><br>    Appellant. | G061890<br><br>(Super. Ct. No. 21D007379)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Carmen R. Luege, Judge.  Affirmed in part, reversed in part, and remanded.

Strunk Loos and Shannon R. Thomas for Appellant.

Sarieh Law Offices, Wail Sarieh and Jennifer Axelrod for Respondent.

L.J. (Wife) and R.J. (Husband), who are now going through a marital dissolution, are the parents of three young children.  It is unclear when their relationship

began to deteriorate, but certainly by late 2021, the marriage was on an untenable path and Wife was seeing someone else.

Wife filed for divorce after seeking and obtaining a temporary domestic violence restraining order (DVRO) against Husband. In October 2021, Husband had wielded a weapon inside the couple's home and threatened to kill her (the gun incident). Even so, her request for a permanent DVRO was denied, with the judge then presiding, leaving the door open to reconsideration if there were new allegations. The DVRO and marital dissolution proceedings were merged.

A little less than one year later, Wife filed a new request for a DVRO. This time, she pointed to a pattern of controlling and obsessive behavior by Husband, in addition to the gun incident. She also told the trial court her children were essentially being threatened and/or weaponized against her by Husband, and that he was systematically turning neighbors and friends against her. She wanted a DVRO protecting her and the children. The court granted the DVRO and ordered Husband to obtain a mental health assessment.

Husband appeals not just the grant of the DVRO, but also its requirement that he obtain a mental health evaluation and treatment plan. The trial court felt he was struggling to cope with the breakdown of his marriage and his wife's new relationship, and his struggles were becoming a danger to himself and his children. We appreciate the court's concerns. However, we agree with Husband that the assessment order was an abuse of discretion. We reverse this aspect of the court's ruling and remand it so the issue can be corrected. We affirm the remainder of the DVRO.

FACTS

Wife and Husband had an argument before Husband left for work. Husband awakened Wife and accused her of being in love with her personal trainer (Boyfriend). He then told her he was going to "go get a gun to kill us all." According to

2

Wife, this was not the first time Husband had threatened to kill her—indeed, he had just made the threat the week before.[1]

Husband proceeded to remove a handgun from the family gun safe and carry it in front of Wife. Wife took a video of this incident and sent the video to her mother. She "thought he was going to kill" her and the children, and she wanted her mother to "have a record of it."

Wife's mother notified the police, who responded to the couple's residence after Husband had departed for work. Husband was ultimately arrested and an emergency protective order was issued because of the incident.

The following day, Wife filed an ex parte request for a DVRO. A temporary DVRO issued that day, and a hearing was conducted to consider the possibility of a permanent DVRO. After hearing testimony from Wife and Husband, the judge presiding at the time declined to issue a permanent DVRO. Husband had testified he had gotten the gun because he was concerned Boyfriend might be able to access it. The judge seemed to think Husband's concern about his wife's frequent communication with Boyfriend was credible. Having watched Wife's video of the gun incident, the judge noted Husband had walked around with the gun in his hand, but had then secured it in his waistband behind him and later put it back. According to the judge, Husband did not appear to threaten anyone or lose his temper in the video. The judge also questioned whether Husband had ever made any threats because Wife had never called the police and had waited several weeks to seek a restraining order after Husband supposedly began making the threats. The court left open the possibility that grounds for a permanent DVRO might later come to light, stating Wife could refile based on any new allegations. Shortly after filing for the DVRO, Wife initiated divorce proceedings.

---

[1] Husband testified he had caught Wife and Boyfriend in a compromising position in the back of Boyfriend's truck about 10 days prior.

3

In March 2022, the Orange County Sheriff's Department sought and obtained a gun violence restraining order (GVRO) against Husband based on the gun incident. At the GVRO hearing, the trial court found by clear and convincing evidence that Husband posed a significant danger to himself or others by possessing firearms. He was required to surrender his firearms and prohibited from possessing any for a period of five years.

In April 2022, Husband and Wife were to do a custody exchange of the children in front of the family home. Husband chose to record the exchange and insisted he be permitted to enter the residence to view some slab-leak damage that had occurred. The video shows Wife was clearly uncomfortable allowing Husband to enter the home.

Friends and neighbors of the couple began to publicly rebuke and harass Wife over her dispute with Husband, starting in February 2022. In February, one of Husband's close friends had a written and public exchange with Wife on Facebook, faulting her for the situation. In May, the couple's neighbor across the street called Wife "Amber," a pejorative comparison to an actress who had been successfully sued by her former husband for defamation. The neighbor further testified she offered to take pictures of Boyfriend's truck to help Husband prove Boyfriend was living at the residence.[2] Husband's father also e-mailed Wife a photograph he had of her and wrote the word "slut."

On July 1, 2022, Wife filed a new request for DVRO. Her declaration in support of the request cited not only the gun incident, but all of the ensuing conduct summarized above, as well as the GVRO. Wife believed the previous denial of her permanent DVRO request had only "emboldened" Husband. The request was heard by a new judge in August 2022.

---

[2] Wife had been friendly with this neighbor prior to the gun incident.

4

In addition to testimony from Wife, Husband, and their neighbors, Boyfriend testified he was staying in Wife's house for her protection after the gun incident. He testified Wife has a lot of nightmares and seemed scared of Husband.

Boyfriend also testified to the negative impact the discord had on the children. He claimed the six-year-old son had walked up to him after completing a visit with his dad, punched him in the groin, and said, "My dad told me to do that to you." The child then turned to Wife, gestured as if to slit his own throat and said, "My daddy told me to do that to you." On another occassion, Boyfriend recalled waking up around midnight or 1:00 a.m. and finding the child standing over Wife with a knife in his hand. She was trying to talk to him, and he simply held the knife over her and said, "My daddy told me to slit your throat in your sleep." Further, he said the oldest child, a daughter, had become reluctant to visit with her dad. The youngest child, only four years old at the time, reported she had dreamed that her father was drowning her. Boyfriend was cross-examined by Husband's attorney, and Boyfriend's testimony did not vary.

At the conclusion of testimony, the trial court granted a DVRO protecting Wife and the children for a period of three years. The court expressed grave concern about Husband's mental state and his response to his wife's relationship with Boyfriend. It wanted a mental health assessment before it would consider allowing Husband any visitation with his children.

## DISCUSSION

Husband's arguments can be grouped into two categories. First are those pertaining to whether it was proper for the trial court to grant Wife's petition for DVRO at all. Second are those pertaining to the court's order requiring Husband to obtain a mental health assessment. We take each category up separately.

## I. *Grant of the DVRO*

"The purpose of the [Domestic Violence Prevention Act[3]] is 'to prevent acts of domestic violence, abuse . . . and to provide for a separation of the persons involved in the domestic violence for a period sufficient to enable these persons to seek a resolution of the causes of the violence.' [Citation.] To that end, the DVPA provides for the issuance of restraining orders that enjoin 'abuse.' Sections 6203 and 6320 define 'abuse' to include stalking, harassment, striking, and battering. [Citations.] A trial court has broad discretion under the DVPA to determine whether to grant a petition for a restraining order. [Citation.] [¶] We review an order granting or denying a DVRO for abuse of discretion. [Citation.] In reviewing the trial court's factual findings, we apply the substantial evidence rule. [Citation.] The inquiry is whether substantial evidence supports the court's finding, not whether a contrary finding might have been made. [Citation.] We accept as true all evidence tending to establish the correctness of the trial court's findings and resolve every conflict in favor of the judgment. [Citation.]" (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1143-1144.)

The DVPA does not encompass just physical abuse or harassment, but also "coming within a specified distance of, or disturbing the peace of the other party, and, in the discretion of the court, on a showing of good cause, of other named family or household members." (§ 6320, subd. (a).)

As this court recently summarized, "'"[T]he plain meaning of the phrase 'disturbing the peace of the other party' in section 6320 may be properly understood as conduct that destroys the mental or emotional calm of the other party."'" [Citation.] What disturbs the peace of a person differs in each case. [Citations.]" (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 981.)

---

[3] Domestic Violence Prevention Act (DVPA) Family Code, section 6200 et seq. All further statutory references are to the Family Code, unless otherwise indicated.

Husband argues the trial court improperly relied on information contained in transcripts and records from the GVRO matter in March 2022. He also believes the previous judge's refusal to issue a permanent DVRO should have had res judicata effect as to whether the gun incident constituted domestic violence. Without the GVRO or the gun incident, Husband says, Wife could not have met her burden to show "reasonable proof of a past act or acts of abuse" by a preponderance of the evidence. (§ 6300, subd. (a).) We disagree.

*A. GVRO*

In preparation for the DVRO hearing, Wife asked the trial court to take judicial notice of the November 2021, DVRO hearing transcript, two GVRO hearing transcripts from March 2022, and the GVRO issued on March 10, 2022. The court granted this request and took judicial notice of these materials. As it issued its ruling from the bench, the court found several facts compelling in its review of the GVRO transcripts.

The court noted the GVRO was prosecuted by the sheriff, not by Wife, and the GVRO would only expire after five years, rather than a shorter time period. The court also observed that GVRO proceedings are pursuant to Penal Code section 18175, by which the petitioner must prove by *clear and convincing evidence* that the subject poses a danger to himself or others through possession of firearms. (Pen. Code, § 18175, subd. (a).) When Husband went to the family home in April 2022, said the court, he already knew the GVRO had been adjudicated against him. Finally, the court recited a fact which apparently had been adduced at the GVRO hearing: Husband potentially had access to a .40-caliber rifle owned by his father. This worried the court.

Husband is correct that the GVRO transcripts were never taken into evidence, and thus, the only method by which the trial court could consider them was through judicial notice. Under Evidence Code section 452, subdivision (d), the court can take notice of the records of any state court. However, this does not mean the

7

truthfulness and proper interpretation of the records are indisputable. (See *Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1, 14-15.) It was error for the court to have considered the contents of the transcripts for their truth.

It is proper for the trial court to take judicial notice of an order of the court contained within the court record. Here, the court could take judicial notice of the GVRO itself. The GVRO is a part of the record because it was attached as an exhibit to Wife's declaration in support of her DVRO request. The GVRO proves most of the facts highlighted by the court—the GVRO's duration, the applicable evidentiary standard, and its date of issuance relative to Husband's conduct.[4] The GVRO does not prove whether Husband's father owned a rifle and whether Husband had access to that rifle. Therefore, the court could not rely on these facts. But setting aside inadmissible testimony, and considering only the proper judicially noticed facts, we find sufficient admissible evidence exists to support the court's conclusion.

Husband says the trial court's consideration of the GVRO was an abuse of discretion because GVRO proceedings are governed by a clear and convincing evidence standard, whereas DVRO's are governed by a preponderance of the evidence standard. He is correct about the differing standards, but we do not see how this helps him. In a case in which the petitioner's evidentiary burden was *higher*, Husband was found to be a danger to himself and others.

B. *Effect of November 2021 Hearing*

"The doctrines of res judicata and collateral estoppel bar relitigation of a factual dispute even when the factual dispute was erroneously decided in favor of a party who did not testify. [Citations.] '"Collateral estoppel" is an awkward phrase, but it

---

4      Indeed, the GVRO, printed on California Judicial Council form GV-030, clearly states, "The court finds by clear and convincing evidence that . . . [¶] . . . the Restrained Person poses a significant danger of causing personal injury to themselves or another by having in their custody or control, owning, purchasing, possessing, or receiving firearms, ammunition, or magazines."

stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' [Citation.]" (*Hawkins v. SunTrust Bank* (2016) 246 Cal.App.4th 1387, 1393.)

Husband would have preferred that Wife be collaterally estopped from resurrecting the gun incident. But the previous judge's ruling pertaining to it did not have preclusive effect. We can glean this from the previous judge's own words: "[T]he court cannot conclude that domestic violence has occurred *based on this record.* [¶] . . . [¶] . . . I'm denying the request for a [DVRO]. However, any party is free to refile based on new allegations. . . . [¶] . . . [¶] . . . [I]t appears to the court that there is little to no chance that these circumstances will reoccur. So *under these circumstances*, the court denies the request for a [DVRO]. [¶] As stated, *any party can reapply should the need arise in the future*." (Italics added.)

If anything, the November 2021 ruling would only have precluded Wife from reapplying for a DVRO based on the exact same allegations stated in her previous petition. This she did not do. She listed the gun incident in her 2022 petition, and added several new allegations: the GVRO, the April 2022 incident, her children's disturbing statements, and third-party antipathy toward her which she believed was being fomented by Husband. The trial court was correct to consider the gun incident in light of the new allegations.

*C. New Allegations*

Given our determinations that portions of the GVRO and the gun incident were properly considered by the trial court and were sufficient to establish a disturbance of Wife's and the children's peace, we need not opine on whether Wife had sufficient additional evidence, standing alone, to support issuance of the order.

9

## II. *Mental Health Assessment Order*

Wife did not just seek to avoid contact with Husband. She asked the trial court to order him to complete a batterer intervention program and seek help for anger management. After hearing all of the testimony and considering all of the evidence, the trial court seemed to take Wife's request to heart—it ordered "a mental assessment" of Husband. It did so because it found Husband's actions and demeanor troubling: "I don't know how to look at this evidence and not walk away thinking this is not a close case. . . . The way that you testified to me, you have this monotone tone to it. I looked at you, you never made any eye contact with me. Even when I asked you questions, you didn't make any eye contact. [¶] It speaks to me of someone who is controlling the anger but afraid that the anger be seen. So you have this very monotone control approach, and I think that behind that is all the anger that you're carrying because you do feel victimized by the affair, and I'm not here to tell you [sic] shouldn't feel victimized. But I am going to tell you [sic] need to deal with those feelings."

The trial court had also previously ordered Wife and Husband to do co-parenting therapy, but no therapy had occurred. This clearly irked the court: "I have to tell you that with regards to your emotions, I find it difficult that you are not in therapy. And that despite my insistence of the co-parenting therapy, that that hasn't happened. . . . [¶] . . . I told you the other day you must follow the court order and, frankly, at this point, I want a mental assessment . . . by a professional. [¶] And I want a plan of action to deal with whatever mental issues he's dealing with as a result of the affair, as a result of whatever victimization he thinks he's going through because I think that has to get resolved before he sees the kids. I've got to get that resolved."

Husband challenges this aspect of the DVRO on several grounds: (1) the trial court had no authority under the DVPA to order a mental health assessment, (2) even if it did, the order was unconstitutionally broad and vague, (3) there was no evidence Husband had a mental health condition or required treatment, (4) there was no notice to

10

him that such a procedure could be ordered, and (5) the order improperly shifted the burden from the trial court to Husband to seek out and obtain the appropriate assessment. While we find the trial court had discretion to order a mental evaluation, we agree with Husband that its ultimate order was outside the scope of this discretion.

"""The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]"' [Citations.] The scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .' Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.] If the trial court is mistaken about the scope of its discretion the mistaken position may be 'reasonable', i.e., one as to which reasonable judges could differ. [Citation.] But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.) Although the trial court was understandably concerned given its observations of Husband, its action was erroneous.

While the trial court enjoys broad discretion under the DVPA, there is no provision in it permitting the court to order a mental health assessment. The only provision in the DVPA authorizing any sort of counseling is section 6343, through which the court can order the restrained party to complete a batterers intervention program.

While a psychiatric assessment may be advisable in a family law case to determine custody, the court "is not empowered to order an individual to undergo involuntary psychiatric therapy for an indefinite period of time" where the record does not support it. (*Camacho v. Camacho* (1985) 173 Cal.App.3d 214, 221.) Indeed, such an order would represent "a significant curtailment of [a litigant's] liberty." (See *In re Marriage of Matthews* (1980) 101 Cal.App.3d 811, 818.) As a result, when a family

11

court feels mental health services may be required to make final custody or visitation determinations, it must be mindful of the authority the law gives it. Its order can and must adequately safeguard a party's rights, and this is best done by procedures formulated and delineated by the Legislature.

The trial court made numerous observations of Husband which were a basis for its concern. But we would suggest caution when taking the next step and opining what the underlying causes may be for the behavior. This is best left to mental health professionals.

As Husband correctly observes, the order is outside the DVPA authority. Section 3190 allows the family court to require parents to participate in outpatient counseling for a period of one year if counseling would be in the child's best interest and the custody dispute poses a substantial danger to his or her best interest. (*Id.* at subd. (a).) The court may also make appropriate orders as to the cost of counseling and arrangements to pay for it. (*Id.* at subd. (c).) It must set out the reasons for the findings it makes on the record. (*Id.* at subd. (d).) Here, the trial court did not mention section 3190 and made none of the specific findings required by it.

Section 3111 allows the court to appoint a child custody evaluator where the court feels it is in the best interest of the child. Section 3112 requires the court to inquire into the parents' financial condition to determine if they are able to reimburse the court for the evaluator's cost.

Also, Evidence Code section 730 allows the court to appoint an expert to investigate and report on any fact or matter "as to which the expert evidence is or may be required." A family court does not abuse its discretion when it appoints such an expert to conduct a psychiatric evaluation of clearly troubled litigants if it deems it "necessary . . . to resolve the custody and visitation issues before the court." (*In re Marriage of Kim* (1989) 208 Cal.App.3d 364, 372.)

12

The trial court's vague order in the DVRO did not comport with any of these statutory authorities. It ordered Husband to "undergo a psychiatric assessment by a psychiatrist or psychologist with a report and treatment plan submitted to the court at least [five] days prior to the next hearing." The court did not appoint the provider to ensure the opinion it would receive would be focused and worthy of reliance. It made no written findings as to the need for an evaluation, or the duration of any treatment that might be needed. Nor did it make a provision for the psychiatrist or psychologist's compensation. We therefore reverse and remand this component of the DVRO for the trial court to fashion an appropriate mental health assessment order that complies with existing statutory procedures.[5]

## DISPOSITION

The order granting respondent's request for a DVRO is affirmed. Only the portion of the order requiring appellant to obtain a psychiatric evaluation and treatment plan is reversed and remanded for further proceedings. The parties are to bear their own costs on appeal.

O'LEARY, P. J.

WE CONCUR:

MOTOIKE, J.

DELANEY, J.

---

[5] In light of this conclusion, we need not consider Husband's other arguments about the order's purported inadequacies.

13